**Sylvia Darlene JACK**

v.

**Mark Harlan DILLEHAY, et al.**

Court of Appeals of Tennessee,
at Nashville.

Aug. 16, 2005 Session.

Oct. 26, 2005.

Application for Permission to Appeal
Denied by Supreme Court
May 1, 2006.

Allston Vander Horst, Centerville, Tennessee, for the appellant, Sylvia Darlene Jack.

Richard E. Norman, Nashville, Tennessee, for the appellees, Mark Harlan Dillehay and Catherine Ruth Dillehay.

Benjamin C. Regen, Dickson, Tennessee, for the appellees, Ann Shepard Bonadio and Michael Bonadio.

Scott C. Williams, and Stephanie S. Maxwell, Columbia, Tennessee, for the appellees, First National Bank and J.B. Walker, Trustee.

Michael E. Sptizer, Hohenwald, Tennessee, for the appellees, Alvin G. Hess and Anita E. Hess.

Daniel L. Wischhof, Brentwood, Tennessee, for the appellees, Ronnie Bentley and Barbara Bentley.

Timothy V. Potter, Dickson, Tennessee, for the appellee, Norma Jean Rochelle Lovlace.

## OPINION

DAVID R. FARMER, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and WILLIAM H. INMAN, Sr. J., joined.

This case arises from a boundary dispute involving thirty-two (32) acres of land in Hickman County, Tennessee. Plaintiff Sylvia Darlene Jack filed suit against Mark and Catherine Dillehay seeking a declaration of ownership of the disputed tract. In response, the Dillehays denied Ms. Jack's claim of ownership and asserted the statutory defenses of estoppel and bar under Tenn.Code Ann. §§ 28–2–109 and 28–2–110. The Dillehays also argued that Ms. Jack could not claim ownership in the disputed property because her predecessor in title had entered into an oral agreement with the Dillehays' predecessor in title establishing a boundary line which gave the Dillehays ownership in the disputed acreage. At trial, the court ruled for the Dillehays for three reasons. First, the court held that Ms. Jack failed to carry her burden of proof in showing entitlement to the disputed tract. Second, the trial court found that Ms. Jack was estopped from claiming ownership of the disputed property due to an oral boundary agreement entered into by her predecessor and the predecessor of the Dillehays. Finally, the

trial court ruled that Ms. Jack's claim was barred under §§ 28–2–109 and 28–2–110. Ms. Jack appeals. We affirm.

### Factual Background and Procedural History

This case arises from a dispute between Sylvia Darlene Jack ("Ms.Jack") and Mark and Catherine Dillehay ("the Dillehays") concerning 32 acres of property located in Hickman County, Tennessee.[1] The disputed property is included in the legal descriptions of grants of adjacent property originating from two sources. The first grant originated in 1953, when Robert and Flossie Harrington conveyed property to Ellis Cannon ("Mr.Cannon"), predecessor in interest to Ms. Jack. This property is shown by and identified as Map 71 Group 00 Parcel 58.00 on the official tax maps of Hickman County, Tennessee. Ms. Jack, Mr. Cannon's niece, began living on the property with Mr. Cannon in 1979. In 1985, Mr. Cannon conveyed the property to Ms. Jack and reserved a life estate interest for himself. Upon Mr. Cannon's death in 1992, the remainder interest in the property vested in Ms. Jack and she became the sole owner in fee simple absolute.

The second grant in this case originated in 1960 when James and Jewel Ayedelott conveyed land in Hickman County to Clyde Shepard ("Mr. Shepard") and Guy Smithson ("Mr. Smithson"). This property was shown by and identified as Map 83 Group 00 Parcel 8.00 on the official tax maps of Hickman County, Tennessee. Between 1960 and 1976, Mr. Shepard and Mr. Smithson made various conveyances to third parties and ultimately divided the remaining portion of the land among themselves in 1976. The portion of the proper-

---

1. This lawsuit also includes several third-party claims and counter-claims. However, this Court does not address these claims since they do not apply to the issues presented for review.

ty allocated to Mr. Shepard was shown by and identified as Map 83 Group 00 Parcel 8.01 ("Parcel 8.01") on the Hickman County tax maps. The official tax maps of Hickman County place the disputed property within Parcel 8.01.

In 1976, Mr. Shepard hired surveyor Robert Jones ("Mr. Jones") to make a plat of the property. At some point during this endeavor, Mr. Jones noticed that the Hickman County tax maps and the muniments of title of Mr. Cannon and Mr. Shepard did not conform as to the correct location of the boundary between Mr. Cannon's and Mr. Shepard's properties. As a result, Mr. Jones met with Mr. Cannon, Mr. Shepard, and Mr. Shepard's son-in-law, James Moore ("Mr. Moore"), for the purpose of determining the proper boundary line. During this meeting, in the presence of Mr. Jones and Mr. Moore, Mr. Shepard entered into an oral agreement with Mr. Cannon as to the boundary line between the two properties, with both parties agreeing that the property now in dispute belonged to Mr. Shepard. Mr. Jones completed the plat on July 29, 1977.

On July 20, 1976, Mr. Shepard conveyed the land identified as Parcel 8.01, which included the disputed property, to two of his daughters, Barbara Bentley ("Ms. Bentley") and Betty Moore ("Ms. Moore"). Ms. Bentley and Ms. Moore later conveyed a one-third undivided interest in the property to their other sister, Ann Bonadio ("Ms. Bonadio") on April 8, 1977. On July 24, 1979, Ms. Moore conveyed her share of the property to herself and her husband as tenants by the entirety. Likewise, on the same date, Ms. Bonadio also conveyed her share of the property to herself and her husband as tenants by the entirety.

In 1980, Ms. Bentley, the Bonadios, and the Moores partitioned the lands into three parcels of approximately equal value. At this time, they once again hired Mr. Jones

to prepare a survey plat and accompanying legal descriptions for the new parcels. The parcel granted to Ms. Bentley contains the disputed property in this case and continues to be shown by and identified as Parcel 8.01 on the Hickman County tax maps. Ms. Bentley and her husband later took out a loan from First National Bank ("the Bank") and secured payment thereof by executing a deed of trust on the parcel granted to Ms. Bentley in the partition. However, the Bentleys defaulted on their loan obligation and the Bank foreclosed on the property in November 1982. The Bank subsequently conveyed the Bentley property by trustee's deed to Mr. Rochelle and Ms. Lovelace. In 1986, Mr. Rochelle and Ms. Lovelace conveyed the property by warranty deed to Mr. and Ms. Hess. In 1996, Mr. and Ms. Hess conveyed the property by warranty deed to the Dillehays for a purchase price of $43,000.

At all times since the 1975 division of property between Mr. Smithson and Mr. Shepard, the property taxes on Parcel 8.01, which includes the disputed property, have been paid by Mr. Shepard and his assigns. The sisters paid all applicable city and county taxes on Parcel 8.01 from the time they received the property in 1976 until the property was partitioned in 1980. Subsequently, Ms. Bentley alone paid the property taxes on Parcel 8.01 until 1982, when the property went into foreclosure. After purchasing the property from the Bank, Mr. Rochelle and Ms. Lovelace paid county and city property taxes for Parcel 8.01 from 1982 until they sold it to Mr. and Ms. Hess in 1986. Mr. and Ms. Hess paid county and city property taxes for Parcel 8.01 from 1986 until they sold it to the Dillehays in 1996. The Dillehays have paid county and city property taxes on Parcel 8.01 since 1996.

In 1996, Ms. Jack's son, Chris Jack, discovered that the Dillehays had placed

"no trespassing signs" on the disputed property. The Jack's later discovered that the Dillehays had also built a cabin on a portion of the disputed property. As a result, Ms. Jack hired a surveyor, Boyd Gibbs ("Mr. Gibbs"), to determine the true boundaries of her property. Mr. Gibbs performed a field survey, resulting in the "Gibbs Platt," and found two potential encroachments on Ms. Jack's property. The first consisted of a seven-and-one-half acre encroachment by the Bonadios and Mr. Smithson. The second encroachment involved the thirty-two acres in dispute here.[2] As a result, on October 30, 1997, Ms. Jack filed suit against the Dillehays, the Bonadio's, and Mr. Smithson. The Bonadios and Mr. Smithson settled Ms. Jack's claims by conveying to her any interests they held in the disputed seven-and-one-half acres. However, the Dillehays disputed Ms. Jack's ownership claims to the thirty-two acres at issue. In their Answer to Ms. Jack's complaint, the Dillehays asserted statutory defenses of estoppel and bar under Tenn.Code Ann. §§ 28–2–109 and 28–2–110. They also argued that Ms. Jack could not claim ownership in the disputed property because her predecessor, Mr. Cannon, entered into an oral agreement with the Dillehays predecessor, Mr. Shepard, as to where the boundary line to his property was, and such boundary did not include the disputed thirty-two acres.

A two-day bench trial was conducted September 18–19, 2003, in the Chancery Court of Hickman County, Tennessee. At the conclusion of the proof, the trial court issued a memorandum opinion and found that Ms. Jack had "not carried her burden of proof in showing that she [was] entitled to the disputed thirty-two acre tract." Rather, the trial court held that

[t]he Dillehays are the owners of the disputed property by reason of an oral boundary line agreement entered into between Ellis Cannon and Clyde Shepard in the presence of Robert Jones and James Moore, which resulted in Mr. Jones' survey. This agreement established a boundary line in 1976 between Cannon and [Shepard] and is binding upon the parties and their successors and assigns....

Further, the evidence supports that [the] Dillehay[s] and their predecessors in title have for not less than twenty years next preceding commencement of this action had assessed and have paid applicable city and county real property taxes with respect to the disputed property. The Dillehays, therefore, are entitled to presumptive ownership of the disputed property [under Tenn.Code Ann. § 28–2–109] and this presumption has not successfully been rebutted by Jack. Additionally, [under Tenn.Code Ann. § 28–2–110,] Jack and those through whom she claims have failed to have assessed or to pay applicable city or county real property taxes with respect to the disputed property for a period not less than twenty years next preceding the commencement of this civil action.

Ms. Jack appeals.

## Issues Presented

The issues on appeal, as we perceive them, are:

2. At trial, a map of the disputed property was introduced as part of Exhibit 10. On this map, the four corners of the disputed property were marked as points "d," "E," "7," and "9." Points "d" to "E" represent the northern boundary of the property—which the Dillehays argue is the boundary between their property and that of Ms. Jack. Points "7" to "9" represent the southern boundary of the disputed property, which Ms. Jack argues is the boundary between her property and that of the Dillehays. Quoted portions of the trial transcript refer to these points in describing the boundaries in this case.

(1) Whether the trial court correctly ruled that the Dillehays are the owners of the disputed property by reason of a boundary line agreement entered into between Mr. Cannon and Mr. Shepard, the Dillehays' predecessor in title.

(2) Whether the trial court correctly ruled that Ms. Jack's claims were barred by operation of Tenn.Code Ann. § 28–2–110.

(3) Whether the trial court correctly ruled that the Dillehays are owners of the disputed property by statutory presumption under Tenn.Code Ann. § 28–2–109.

(4) Whether the trial court erred in ruling that Ms. Jack failed to make out a prima facie case that she was the true owner of the disputed property in this case.

(5) Whether the trial court erred in applying the burden of proof to the parties in this case.

For the reasons set forth below, we affirm the trial court.

## Standard of Review

██ Our standard of review of a trial court sitting without a jury is *de novo* upon the record. *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn.1995). There is a presumption of correctness as to the trial court's findings of fact, unless the preponderance of evidence is otherwise. Tenn. R.App. P. 13(d)(2005). However, no presumption of correctness attaches to a trial court's conclusions on issues of law. *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000). Where the trial court makes no specific findings of fact on a matter, we must review the record to determine where the preponderance of the evidence lies and accord no presumption of correctness to the conclusions of the court below.

*Kendrick v. Shoemake*, 90 S.W.3d 566, 569 (Tenn.2002).

## Oral Boundary Agreement

██ Ms. Jack asserts that the trial court erred in finding an oral boundary agreement in this case for three reasons. First, Ms. Jack argues that the agreement between Mr. Cannon and Mr. Shepard occurred after Mr. Shepard had conveyed the property to his daughters, thus leaving him with no authority to enter into such an agreement with Mr. Cannon. Second, Ms. Jack contends that there was no actual boundary dispute as to the boundary location in this case. Finally, Ms. Jack argues that the trial court erred in finding that Mr. Cannon had agreed to an oral modification of his boundary line. For the reasons stated below, we disagree.

██ "It is well settled that parties owning adjoining lands may by agreement establish a boundary line between their land where there is no certain and established line known to them." *Winborn v. Alexander*, 39 Tenn.App. 1, 279 S.W.2d 718, 726 (1954). Such an agreement may be established by oral agreement and is not subject to the statute of frauds. *Brooks v. Brake*, No. 01A01–9508–CH–00365, 1996 WL 252322, at *5 (Tenn.Ct. App. May 15, 1996) (*no perm. app. filed*) (citing *Thornburg v. Chase*, 606 S.W.2d 672, 674 (Tenn.Ct.App.1980)). In order to establish the existence of an oral boundary agreement, a party must prove that

[t]he boundary line fixed by the [oral] agreement ... [is] definite, certain, and clearly marked, and that it ... [is] made by adjoining landowners with reference to the *uncertain or disputed* boundary line between their lands.... In order to enforce an oral agreement to establish the location of a boundary line, the parties must show: 1) a dispute or uncertainty as to the true location of the

boundary line; 2) the agreement of the parties or their predecessors in interest as to the location of the boundary; 3) that the boundary line established by the oral agreement is definite and certain; and 4) possession and use of the property up to the agreed boundary by the parties or their predecessors in interest, or acquiescence in the boundary line.

*Brooks,* 1996 WL 252322, at \*5 (emphasis added) (quoting *Inman v. Nutt,* No. 01–A–01–9209–CH–00352, 1993 WL 46519, at \*2 (Tenn.Ct.App. Feb.24, 1993) (*no perm. app. filed* ))). Once parties establish a boundary line pursuant to oral agreement, they and their successors are estopped from challenging the line, even if it is later discovered that the parties were mistaken as to the location of the line at the time of the agreement. *Galbraith v. Lunsford,* 87 Tenn. 89, 9 S.W. 365, 368 (1888).

At the trial in this case, surveyor Robert Jones testified that uncertainty existed as to the boundary between land then owned by Mr. Shepard, predecessor to the Dillehays, and Mr. Cannon, predecessor to Ms. Jack. Furthermore, in her brief to this Court, Ms. Jack herself admits that uncertainty concerning the boundaries of the disputed property did exist on the Hickman County tax maps. Mr. Moore testified that, as a result of this uncertainty, Mr. Shepard and Mr. Cannon, in the presence of Mr. Moore and Mr. Jones, met to determine the boundary between their property and ultimately agreed that the property now disputed in this case belonged to Mr. Shepard. Mr. Moore also testified that this meeting occurred around the time he and his wife, Ms. Moore, decided to buy the property in 1976. After this agreement occurred, Mr. Dillehay and Mr. Hess testified that they both conducted numerous activities and made improvements upon the property, none of which were ever protested against by Mr. Can-

non or Ms. Jack. After hearing both the direct and cross examination of these witnesses, the trial court made the following findings of fact:

47. In preparing the Jones Plat, Mr. Jones noticed that the official tax maps of Hickman County, Tennessee, and the muniments of title of Mr. Cannon and Mr. Shepard did not conform as to the correct location of the southernmost boundary of Mr. Cannon's land.

. . . .

50. As a result of his discovery of a *potential discrepancy* in a common boundary line, Mr. Jones walked the common boundary line of Mr. Cannon and Mr. Shepard in the company of Mr. Cannon, Mr. Shepard and [Mr. Moore]. . . .

51. Mr. Cannon and Mr. Shepard, in the presence of Mr. Moore and Mr. Jones, agreed that the tree identified as Point "d" on Trial Exhibit No. 10 was the correct southwestern corner of the lands of Mr. Cannon, and that the correct location of Mr. Cannon's southern boundary line was in the location shown on the Gibbs Plat as running from Point "d" to Point "E" on Trial Exhibit No. 10.

. . . .

53. Mr. Jones has no independent recollection of having walked the common boundary line between the lands of Mr. Cannon and Mr. Shepard as related by Mr. Moore at trial.

54. Mr. Jones testified at trial that, in light of the *uncertainty* as to the true location of Mr. Cannon's southern boundary line arising from the discrepancy between the owners' respective muniments of ti-

tle and the public records of Hickman County, Tennessee, as evidenced by Mr. Jones's notation on Trial Exhibit No. 19, and with the adjoining boundary owners alive and available for consultation, he would not have prepared the Jones Plat showing the location of such boundary line without first having obtained the affirmative agreement of and between the adjoining landowners as to the correct location thereof.

55. The evidence supports that Mr. Cannon entered into an oral boundary line agreement with Mr. Shepard that the true location of the southern boundary line of Mr. Cannon's lands was the line shown from Points "d" to "E" on Trial Exhibit No. 10 and defining the northern boundary of the [d]isputed [p]roperty. (Emphasis added.)

Ms. Jack correctly asserts that the trial court made no explicit finding concerning the exact date of the boundary agreement between Mr. Cannon and Mr. Shepard. However, the record shows that the trial court, in its memorandum opinion, did acknowledge the necessity of an oral boundary agreement being made between landowners themselves when it held that such an agreement occurred between Mr. Shepard and Mr. Cannon. Furthermore, the trial court noted that the boundary agreement in this case occurred in 1976 and was subsequently binding upon all of Mr. Shepard's assigns. As a result, we find it implicit in the trial court's conclusion that the boundary agreement in this case occurred prior to Mr. Shepard's conveyance of the property to his daughters. Based on all of the foregoing, we conclude that the evidence does not preponderate against the factual findings of the trial court. We therefore affirm.

### Tenn.Code Ann. §§ 28–2–109 and 28–2–110

Section 28–2–109 of the Tennessee Code states that

[a]ny person holding any real estate or land of any kind, or any legal or equitable interest therein, who has paid, or who and those through whom such person claims have paid, the state and county taxes on the same for more [than] twenty (20) years continuously prior to the date when any question arises in any of the courts of this state concerning the same, and who has had or who and those through whom such person claims have had, such person's deed, conveyance, grant or other assurance of title recorded in the register's office of the county in which the land lies, for such a period or more than twenty (20) years, shall be presumed prima facie to be the legal owner of such land.

Tenn.Code Ann. § 28–2–109 (2000). In interpreting § 28–2–109, Tennessee courts have held that "if a party has paid taxes continuously for more than twenty years and has assurance of title that has been of record for more than twenty years, a *rebuttable* presumption of ownership arises...." *Corrado v. Hickman,* 113 S.W.3d 319, 324 (Tenn.Ct.App.2003) (emphasis added).

Section 28–2–110(a) of the Tennessee Code provides that

[a]ny person having any claim to real estate or land of any kind, or to any legal or equitable interest therein, the same having been subject to assessment for state and county taxes, who and those through whom such person claims have failed to have the same assessed and to pay any state and county taxes thereon for a period of more than twenty (20) years, shall be forever barred from bringing any action in law or in

equity to recover the same, or to recover any rents or profits therefrom in any of the courts of this state.

Tenn.Code Ann. § 28–2–110(a)(2000). Tennessee courts have applied § 28–2–110 in cases to remove cloud on title. *Tidwell v. Van Deventer*, 686 S.W.2d 899, 902 (Tenn.Ct.App.1984) (citing *Lee v. Harrison*, 196 Tenn. 603, 270 S.W.2d 173 (1954)). Courts have also applied this statute in order to "bar a suit by a plaintiff claiming property described in her deed which was also encompassed in a deed made to the defendant." *Id.* at 903 (citing *Alexander v. Patrick*, 656 S.W.2d 376 (Tenn.Ct.App. 1983)). However, parties attempting to rely on § 28–2–110 "must clearly show that the other party failed to pay the taxes." *Bone v. Loggins*, 652 S.W.2d 758, 761 (Tenn.Ct.App.1982).

*Payment of Taxes for 20 years*

Ms. Jack's main argument relating to Tenn.Code Ann. §§ 28–2–109 and 28–2–110 is that the trial court erred in holding that the Dillehays and their predecessors *alone* paid property taxes on the disputed property for the required twenty-year period, thus giving the Dillehays a rebuttable presumption of ownership under § 28–2–109 while also barring Ms. Jack under § 28–2–110 from suing to reclaim the property. In asserting this argument, Ms. Jack first claims that the trial court erred altogether in ruling that proof of payment of taxes for a particular map and parcel number on the Hickman County tax map alone satisfies the tax payment requirement under the statutes. She next argues that, while the trial court correctly found that the Dillehays and their predecessors had paid taxes on Parcel 8.01 of the Hickman County property tax map for over twenty years, the disputed thirty-two acres did not shift over in the tax rolls from Mr. Cannon, Ms. Jack's predecessor, to the sisters, the Dillehays' predecessor, until 1978. Ms. Jack supports this assertion in her brief by pointing out that

> [i]n 1976 and 1977 the Dillehays' predecessors only paid taxes on thirty-seven and one-half acres. (citation omitted). The encroachment could not have been included in this since the encroachment was thirty-two acres. (citation omitted). In 1978 they paid taxes on ninety-two and one-half acres which would have included the encroachment, as would the fifty-eight and one-half acres that have been on the books since 1981.

Thus, according to Ms. Jack's calculations, at the time she filed this lawsuit, only nineteen years had elapsed and thus the trial court erred in finding that Tenn.Code Ann. 28–2–110 acted as a bar against Ms. Jack and that Tenn.Code Ann. 28–2–109 gave the Dillehays an "entitlement to the presumption of ownership." We disagree with both assertions.

■ In addressing Ms. Jack's first argument, we note that this Court has previously held that plats from a county assessor's office are admissible for the purposes of determining who paid taxes on a particular piece of real property. *Whitworth v. Hutchison*, 731 S.W.2d 915, 917 (Tenn.Ct. App.1986). However, Ms. Jack appears to argue that the trial court's reliance upon tax maps and parcels in this case does not conclusively establish who paid property taxes on the property in dispute. We disagree.

At trial, Cheryl Chessor, trustee for Hickman County, Tennessee, testified that the assessor's office assesses, and the county trustee collects, real property taxes assessed against real property enclosed *within the boundaries of various tax parcels* as shown on the official county tax maps. Ms. Chessor stated that the particular number of acres described in a notice of assessment sent to land owners, or even

the particular number of acres in a particular tax parcel as shown on the tax maps, *do not* control the question of exactly what real property is being assessed, since those acreage figures are taken directly from instruments of conveyance containing legal descriptions of real property which can be, and frequently are in rural counties such as Hickman County, materially inaccurate. Thus, according to Ms. Chessor's testimony, it appears that the only way the trial court could have determined the payment of taxes for a particular piece of property in this case would be to compare the tax payment records for a particular tax parcel against the Hickman County tax maps. As a result, we find that the trial court did not err in admitting or relying on tax maps and parcels in determining the payment of taxes on the disputed property in this case.

In addressing Ms. Jack's second argument, we look to the factual findings of the trial court concerning the payment of taxes on the disputed property in this case. In its memorandum opinion, the trial court found:

57. At all times relevant hereto, Hickman County and City of Centerville real property taxes have been assessed with respect to the [d]isputed [p]roperty.

58. At all times relevant hereto, [Ms.] Jack and her predecessor in title, Mr. Cannon, have been assessed and have paid Hickman County real property taxes upon the real property shown and identified on the official tax maps of Hickman County, Tennessee[,] as Map 71 Group 00 Parcel 58.00.

59. At all times relevant hereto, the Dillehays and their predecessors in title ... have been assessed and have paid City of Centerville and Hickman County real property taxes on the real property shown and identified on the official tax maps of Hickman County, Tennessee[,] as Map 83 Group 00 Parcels 8.00 and 8.01....

60. At no time relevant hereto has [Ms.] Jack or her predecessor in title been assessed or paid City of Centerville or Hickman County real property taxes on Map 83 Group 00 Parcel 8.01 or the parcel from which the same was severed, Parcel 8.00.

61. At no time relevant hereto has Dillehay or their predecessors in title been assessed or paid Hickman County real property taxes with respect to Map 71 Group 00 Parcel 58.00.

62. The official tax maps of Hickman County, Tennessee[,] place the northern boundary of Map 83 Group 00 Parcel 8.01 at the northern boundary of the [d]isputed [p]roperty....

63. The official tax maps of Hickman County, Tennessee[,] include within the boundaries of Map 83 Group 00 Parcel 8.01 land which is included within the legal descriptions set forth in both the [Cannon / Jack property] and the [Dillehay property].

64. The official tax maps of Hickman County, Tennessee[,] include within the boundaries of Map 83 Group 00 Parcel 8.01 lands which constitute the entirety of the [d]isputed [p]roperty.

65. The real property tax parcels shown on the official real property tax maps of Hickman County, Tennessee[,] accurately depict thereon the particular real property which is assessed with respect to the various real property tax parcels as

shown on such real property tax maps.

66. The acreage descriptions contained in the muniments of title constituting the parties' respective chains of title do not determine the location of the boundaries of tax parcels.

67. Hickman County, Tennessee's assessments for real property taxes made upon the parties and their predecessors in title for particular and varying amounts of acres are not determinative of which real property is being assessed to a particular landowner, because assessments are made and real property taxes are paid upon the basis of tax parcel identification numbers.

68. The Dillehays and their predecessors in title have been assessed and have paid real property taxes with respect to the [d]isputed [p]roperty for not less than twenty (20) years next preceding the commencement of this civil action, at least as far back as 1975.

69. The Plaintiff and her predecessor in title have not, for a period of at least twenty (20) years next preceding the commencement of this civil action, been assessed or paid any real property taxes with respect to the [d]isputed [p]roperty.

While Ms. Jack did present some evidence that acreage within the parcels fluctuated, the trial court obviously did not find this evidence persuasive. Upon this Court's review of the facts contained in the trial record, we find that the evidence in this case does not preponderate against the findings of the trial court that the Dillehays and their predecessors paid property taxes on the disputed property for over 20 years while Ms. Jack and her predecessor did not.

*Recorded Assurance of Title Under Tenn. Code Ann. §§ 28–2–109 and 28–2–110.*

Ms. Jack also argues that the trial court erred in finding that the Defendants had recorded assurance of title for over twenty years pursuant to Tenn.Code Ann. §§ 28–2–109 and 28–2–110. For the reasons stated below, we affirm the trial court. In relation to § 28–2–110, we find Ms. Jack's argument misplaced because the text of § 28–2–110 does not require that a party have a recorded assurance of title for over twenty years in order to have standing to assert this defense. Rather, as set forth by this Court in *Bone v. Loggins,* 652 S.W.2d 758 (Tenn.Ct.App. 1982), a person need only have some cognizable interest in the property, such as being a holder under color of title, an adverse claimant, or being a beneficiary under a will. *Id.* at 761. We further noted in *Bone* that several Tennessee decisions imply that even a trespasser or one in improper possession of realty could have a legally cognizable interest. *Id.* In the case at bar, the Dillehays are certainly more than mere trespassers. Rather, at a minimum, they have been in possession of the property under color of title since 1996. As a result, we find that the evidence does not preponderate against the trial court's holding that the Dillehays had standing to assert a defense under § 28–2–110 against Ms. Jack.

With regard to § 28–2–109, this statute does expressly require that a party asserting it have recorded assurance of title for over twenty years. However, while it is true that the trial court in this case failed to make an explicit finding that the Dillehays and their predecessors had recorded assurance of title for over twenty years, we hold that such a finding was implicit in the trial court's final ruling. The true boundaries described in the deeds of both parties and their predeces-

sors was a central issue in dispute in this case. In deciding this issue, the trial court heard testimony from three surveyors, Mr. Gibbs, Mr. Duffer, and Mr. Jones. Mr. Gibbs and Mr. Duffer testified that the disputed property was described in the deeds of Ms. Jack and her predecessors. Mr. Jones testified that the disputed property was described in the deed of the Dillehays' predecessor, Mr. Shepard. Upon considering this testimony, the trial court chose to rely on the testimony of Mr. Jones that, at the very least, the deed given to the Dillehays' predecessor, Mr. Shepard, in 1975 contained a legal description of the disputed property.[3] In so ruling, the court made the following findings of fact in relation to Mr. Gibbs and Mr. Duffer:

42. In preparing the Gibbs Plat, Mr. Gibbs began his survey of the lands of the [Cannon / Jack Property] and his plat thereof at what Mr. Gibbs then believed and presently believes to be the correct southwestern corner of the lands of the [Cannon / Jack property] and which is identified on Exhibit No. 10 as Point "7."

43. Mr. Gibbs testified that, if his placement of the southwestern corner of the lands of the [Cannon / Jack] property is incorrect, then his placement of the southern boundary of Plaintiff's lands as shown on the Gibbs Plat would or could be incorrect. Gibbs also testified that he did not believe he was incorrect in his placement of the said southwestern corner.

44. In preparing the Gibbs Plat, Mr. Gibbs did not have available to him as a resource either Mr. Cannon or Mr. Shepard, both men having died

prior to 1997, the year in which Mr. Gibbs was retained by the Plaintiff to prepare the Gibbs Plat.

45. The oak tree identified by Mr. Gibbs as the southwest corner of the ... Plaintiff's lands, identified on Trial Exhibit No. 10 as Point "7," ... is not materially larger than other trees depicted on such videocassette, and does not appear to be significantly older than such trees.

46. The evidence is insufficient to establish that the oak tree identified by Mr. Gibbs as the southwest corner of the lands of the ... Plaintiff's lands is the same corner tree identified and recognized by Mr. Cannon as his southwestern corner.

. . . .

... The Court has [also] considered the testimony of John Duffer.... Duffer, a registered licensed surveyor, did not perform a "full blown survey." In the spring of 1997, he began a four or five month process to complete a report (something less than a survey) of the Jack's property based upon a deed research. This report did not include a field survey. The process used by Duffer in reaching his conclusions are, in the view of this Court, too susceptible to being classified as inaccurate....

In reviewing the record in this case, we find that the evidence does not preponderate against the trial court's implicit conclusion that the Dillehays and their predecessors had recorded assurance of title to the disputed property for over twenty years. *Ellis Cannon's use of the property as a homestead*

Ms. Jack next argues that neither Tenn. Code Ann. §§ 28–2–109 nor 28–2–110

3. In her brief, Ms. Jack acknowledges that the deeds in Dillehays' chain of title contain a description of the disputed property from 1980 onward.

should apply in this case because Ellis Cannon lived on the property adjacent to the disputed property and claimed it as part of his homestead until 1992. In support of this argument, Ms. Jack cites *Winborn v. Alexander*, 39 Tenn.App. 1, 279 S.W.2d 718 (1954), where this Court previously addressed the applicability of Section 9159.1 of Williams Code of Tennessee, the identical predecessor to § 28–2–110, and found the statute inapplicable "because it [did] not appear that complainants failed to pay any taxes on their property, and they ... claim[ed] the disputed strip as a portion of their homeplace and not as a separate lot or parcel of land." *Id.* at 729. We find Ms. Jack's argument here unpersuasive for two reasons. First, in *Winborn*, this Court only addressed the applicability of § 28–2–110, not § 28–2–109. As a result, we find Ms. Jack's reliance upon *Winborn* in relation to § 28–2–109 misplaced in this case. Second, in relation to § 28–2–110, we find the language cited by Ms. Jack from *Winborn* inapplicable to the facts presented in this case.

 While this Court did allude to the fact that the complainants in *Winborn* claimed the disputed property as part of their homeplace, this Court did not create a "homestead exemption" to § 28–2–110. Rather, the consideration as to whether disputed property constitutes a portion of a litigant's homestead is merely a factor courts may consider in determining the payment of taxes when other evidence, such as tax records, fail to preponderate upon such issue. This interpretation of *Winborn* was illustrated and affirmed by this Court in *Smith v. Puckett*, No. 87–

297–II, 1988 WL 23918 (Tenn.Ct.App. Mar. 18, 1988). In *Smith*, the Smiths and Pucketts disputed the ownership of a strip of land adjacent to the Smith property. *Smith*, 1988 WL 23918, at *1–2. At trial, the court found that the Smiths held title to the property, had used the property over a long period of time, and had paid all property taxes on the disputed property. *Id.* On appeal, the Pucketts argued that the evidence preponderated against the trial court's holding that the Smiths had paid taxes on the disputed property,[4] and thus the Smiths' claim should have been barred under § 28–2–110. *Id.* at *2. In affirming the trial court's finding of fact concerning property tax payments, we concluded that

> [s]ince the area in question was attached to and contiguous to the property on which the taxes were paid, we are of the opinion that the evidence does not preponderate against the chancellor's finding. *Winborn v. Alexander*, 39 Tenn. App. 1, 279 S.W.2d 718 (1954). There is simply no way to tell from the record what property was included in the assessment paid by the Smiths. The tax receipts in the record prior to 1974 do not show separate parcel numbers for any of the property in this area.

*Id.* at *2.

Unlike in *Smith*, the trial court in this case found sufficient evidence in the Hickman County tax records to determine that Ms. Jack and her predecessor, Mr. Cannon, did not pay property taxes on the disputed property for over twenty years. Instead, the court found that the Dillehays

---

4. Specifically, the Pucketts argued that the evidence preponderated against the trial court's findings

> because the number of acres assessed to Mr. Westbrooks [the Puckett's predecessor] was never lowered after the sale to Mr. Henry [the Smith's predecessor], the [dis-

puted property] was never assessed separately to Mr. Henry or his successors in title, and when the entire county was mapped and reappraised in 1974 the records showed the corridor as being part of the property now owned by the [Pucketts].
*Smith*, 1988 WL 23918, at *2.

and their predecessors made such payments. Upon review of the record in this case, we find that the evidence does not preponderate against the trial court's findings.

*Payment of City Taxes*

 Ms. Jack next argues that the trial court erred in holding that Tenn.Code Ann. §§ 28–2–109 and 28–2–110 applied to the payment of city taxes. We find this argument to be without merit. In its memorandum opinion, the trial court found that the Dillehays had paid all city *and* county taxes on the disputed property for over twenty years. The court also found that Ms. Jack and her predecessor, Mr. Cannon, had not paid city *or* county taxes on the disputed property for over twenty years. While the trial court did note the payment of city taxes in its memorandum opinion, we find nothing in the record to suggest that this was the basis for the court to apply the statutes. Rather, this appeared to serve as further evidence that Ms. Jack and her predecessor had never paid taxes on the disputed property. Ms. Jack herself admitted at trial that a portion of the disputed property fell within the city limits of Centerville, Tennessee. Thus, evidence showing that city taxes were never assessed to Ms. Jack before this lawsuit arose further shows that she did not pay taxes on the disputed property. However, even had the trial court relied upon the payment of city taxes in applying the statutes in this case, we find such an error harmless since the court also found that the Dillehays had paid all county taxes on the disputed property while Ms. Jack did not.

*Conclusion on Applicability of Tenn.Code Ann. §§ 28–2–109 and 28–2–110*

Based on all of the foregoing, we conclude that the evidence does not preponderate against the findings of the trial court that the Dillehays are entitled to a presumption of ownership under Tenn. Code Ann. § 28–2–109 and that Mrs. Jack is barred from asserting a claim under Tenn.Code Ann. § 28–2–110. For these reasons, we affirm.

### Prima Facie Case and Burdens of Proof

In her final argument to this Court, Ms. Jack asserts that the trial court erred in allocating the burdens of proof in this case. Ms. Jack further argues that the trial court erred in discounting or rejecting her proffered evidence of ownership of the disputed property in this case. We find both of these arguments to be without merit.

Upon review of the record in this case, we find no error in the trial court's allocation of the burden of proof. We also find no error in the trial court's rejection of Ms. Jack's proffered evidence at trial. The record shows that both Ms. Jack and the Dillehays had full opportunity to present all relevant evidence before the court. Upon review of this evidence, the trial court found the evidence submitted by the Dillehays more reliable than that presented by Ms. Jack. Specifically, in addition to the findings already quoted in this opinion, the trial court made the following factual determinations which support its decision:

27. Mr. Cannon, and from time to time his family and friends, including [Ms.] Jack, would gather with Mr. Shepard, and from time to time, his family and friends, at a common corner of the lands of Mr. Cannon and the lands of Mr. Shepard and Mr. Smithson, which corner was at the southwestern corner of Mr. Cannon's lands, for the purposes of visiting, talking and consuming alcoholic beverages.

28. Upon recollection of [Ms.] Jack, the common corner at which Mr. Cannon and Mr. Shepard and their respective families and friends would gather was located at a distance from a certain barn ... approximately equal to the distance from the Court's bench to the parking lot of the Hickman County Justice Center.

29. The distance from the barn ... [to the point] that marks the northwestern corner of the [d]isputed [p]roperty, is approximately 300 feet, which is an approximately similar distance to the distance between the Court's bench to the parking lot of the Hickman County Justice Center.

30. The distance from the barn as located on Trial Exhibit No. 11 by [Ms.] Jack to the point identified on Trial Exhibit No. 11 as Point "7," and which marks the southwestern corner of the [d]isputed [p]roperty, is approximately 900 feet, a materially and unmistakably greater distance than the distance from the Court's bench to the parking lot of the Hickman County Justice Center.

31. More probably than not, the meetings at the common corner recalled by Plaintiff occurred at the point identified on Trial Exhibit No. 10 as Point "d."

32. Mr. Cannon at some point during the late 1950's or early 1960's showed to the witness Harry Harrington, who was then a child, a tree which Mr. Cannon identified as his southwestern corner tree.

33. The tree showed by Mr. Cannon to the witness Harrington and identified by Mr. Cannon as his southwestern corner tree had, by Mr.

Harrington's recollection, a wire fence attached to it.

34. The tree identified as on Trial Exhibit No. 10 as Point "d," ... and which marks the northwestern corner of the [d]isputed [p]roperty, has the remains of a wire fence protruding from the center of the tree, with a horizontal scar plainly visible on the surface of the tree where the tree appears to have grown out around the wire.

35. Other trees depicted on the videocassette tape admitted into evidence as a part of Trial Exhibit No. 10 and shown on such videocassette tape as being located along the [d]isputed [p]roperty's western boundary also have the remains of the wire fencing protruding from the centers of such trees, and have similar horizontal scars plainly visible on their surfaces where such trees appear to have grown out and around the wires shown.

36. The oak tree identified as on Trial Exhibit 10 as Point "7,"... and which marks the southwestern corner of the [d]isputed [p]roperty, does not evidence any sign or other indication that the same has or ever has had any wire fence attached to it, nor does the tree exhibit any evidence of any scar on the surface thereof.

. . . .

38. If the tree recalled by Harry Harrington still exists, it is probably the tree identified as Point "d" on Trial Exhibit No. 10 and marking the [northwestern] corner of the [d]isputed [p]roperty.

39. At some undetermined point, Mr. Cannon showed to Christopher Jack ... a tree which Mr. Cannon

identified . . . as marking his south-western corner.

40. [Christopher] Jack was a small child at the time Mr. Cannon showed him the tree which Mr. Cannon identified as marking Mr. Cannon's southwestern corner.

41. [Christopher] Jack believes the tree showed to him by Mr. Cannon and identified by Mr. Cannon as marking Mr. Cannon's southwestern corner is the same oak tree shown on the Gibbs Plat and on Trial Exhibit No. 10 as Point "7," and which is the southwestern corner of the [d]isputed [p]roperty.

. . . .

74. The records of the partnership of Mr. Shepard and Mr. Smithson reflected that Mr. Shepard and Mr. Smithson paid Mr. Cannon to cut timber from various lands, including the lands of the [d]isputed [p]roperty, and paid Mr. Cannon solely for his labor and not for any trees cut.

We find that the evidence does not preponderate against the factual findings of the trial court. The judgment of the trial court is affirmed and costs are taxed to the appellant, Sylvia Darlene Jack, and her surety.